**UNITED STATES of America**

v.

**Charles Thomas GRIFFIN, Joe Henry Chambers and Charles Yielding.**

**No. LR–CR–77–9.**

United States District Court,
E. D. Arkansas, W. D.

Dec. 28, 1978.

W. H. Dillahunty, U. S. Atty., Samuel A. Perroni, Asst. U. S. Atty., Little Rock, Ark., for plaintiff.

William R. Wilson, Jr., Little Rock, Ark., for Yielding.

John Forster, Jr., North Little Rock, Ark., for Chambers.

Leon Catlett, Little Rock, Ark., for Griffin.

## MEMORANDUM AND ORDER

EISELE, Chief Judge.

█ Pending before the Court is the motion of the defendant Charles Yielding and the government to set a date certain to present to the Court the plea agreement which has been struck between the parties in this case. It is not now, nor has it been, the practice of this Court[1] to consider such agreements,[2] even though the Court is cognizant of the provisions of Rule 11(e), Federal Rules of Criminal Procedure, which make such consideration optional.

█ The addition of section (e) to Rule 11 in the 1975 Amendments to the Federal Rules of Criminal Procedure was a recognition, rather than endorsement, of the practice of plea bargaining. Senator McClellan

[1]. As used in this opinion, "Court" refers only to the authoring judge. No effort has been made to adopt a uniform policy for this district with respect to the issue discussed.

[2]. For the purposes of this opinion, the Court is excluding "count" bargaining, referred to in Rule 11(e)(1)(A), because it has not found an appropriate way to prevent this practice, it being generally held that this is a matter of prosecutorial discretion. This form of bargaining can also be abused, however. It encourages the prosecutor to pyramid charges. It has great potential for deception, intended or unintended. The fact that it is considered in the context of a "bargain" necessarily suggests to the defendant that if he pleads guilty to one or more counts, he gets some real benefit from the dismissal of other counts. But in the great majority of cases this is not true since the sentence that may be imposed upon one count generally exceeds the sentence that would actually be imposed even if the defendant had pled guilty to all counts. And ordinarily the sentence on the one count will not be less than the sentence that would have been imposed on all counts (although it might be structured differently). An example will make this clear.

Suppose an indictment charges a defendant and others with a conspiracy to manufacture and pass counterfeit bills and the overt acts charged indicate that several million dollars worth of such bills were so manufactured and distributed throughout the United States. Further assume that after the conspiracy count there were 50 substantive counts against the same defendant, the last of which charges the defendant with passing a $10 counterfeit bill at the local grocery store. The government proposes to dismiss all but the last count. At sentencing the judge will have before him the pre-sentence report setting forth all of the facts relating to all of the charges contained in the indictment. No court, it is submitted, will put on blinders and limit its attention to the passing of the one $10 counterfeit bill. Rather, the court will put the defendant under oath and question him about his participation in the entire criminal venture. If he admits such participation, the court will take such circumstances into consideration when sentencing him. The result in the hypothetical case might be that the defendant would receive the maximum sentence under the one remaining count, whereas if that count were the only charge against the defendant, he might well have been placed upon probation.

It has been pointed out that only in exceptional cases will a defendant benefit from a count dismissal bargain. The example just given, however, points out the potential vice which occurs when, in the exceptional case, the defendant does receive a concrete benefit from the dismissal of other counts. In those situations, the defendant and the government would be aware that the court would impose a sentence in excess of the statutory maximum for the one count if there were a plea of guilty to

in the Senate debate of July 17, 1975, made this statement:

"Rule 11 of the Federal Criminal Rules deals with entry of pleas in criminal cases. The amendments to this rule proposed by the Supreme Court, particularly those relating to plea bargaining, have provoked much comment and some criticism. Plea negotiation is a fact in the present criminal system and crowded court dockets make it unlikely that the situation will or should change. It is therefore probably a good idea that such a widespread practice should be dealt with by the criminal rules and our proposed amendment accepts the basic structure of rule 11 as proposed by the Supreme Court."

Congressman Hagedorn in the House debate on June 23, 1975, expressed much the same attitude:

"While plea bargaining has recently been viewed in a bad light, it has long served as an integral part of the criminal justice system."

He also added:

"Each judge would have the authority to allow or prohibit plea bargaining in his own court room."

House Report (Judiciary Committee) 94-247, in discussing Rule 11(e), says:

"This procedure permits the parties to discuss disposing of a case without a trial and sets forth the type of agreements that the parties can reach concerning the disposition of the case. The procedure is not mandatory; a court is free not to permit the parties to present plea agreements to it."

During its testimony before the Judiciary Committee, the Advisory Committee of Criminal Rules of the Judicial Conference of the United States stressed that the Rule does not require a court to permit any form of plea agreement to be presented to it.

From the legislative history of the Rule, then, it is abundantly clear that it is within the discretion of the Court to consider plea bargains or to refuse to hear them.[3]

The Court wishes to make clear some of its reasons for refusing to hear plea bargains. It is the Court's opinion, probably a minority opinion, that the process of negotiating pleas has a tendency to demean all participants: the attorneys, the defendant, and even the Court.[4] There are "back-

---

more than one count or a verdict of guilty upon more than one count. In this context, the prosecutor, in effect, becomes the judge. He determines the sentence since he knows the court will impose the maximum for one count and cannot assess a greater penalty.

To further complicate the situation (where counts are dismissed) our courts have been informed that the Parole Commission considers dismissed counts in determining the salient factor scores (which determine release dates) whether or not there is a proper factual record (e. g., the admission of the facts by the defendant) for doing so.

It is the Court's view that this problem is one that addresses itself to very serious consideration by and within the executive branch of our government and particularly the Department of Justice.

**3.** In this case the attorneys for the government and for the defendant, perhaps in order to test this Court's refusal to consider negotiated pleas, have joined in the motion that the Court

hear their plea agreement, apparently relying on the language of Rule 11(e) that states:

"If a plea agreement has been reached by the parties, the court *shall*, on the record, require the disclosure of the agreement . . . ." (Emphasis added.)

To read this language as mandating consideration of such agreements is to do violence to the procedure the Congress clearly intended to establish in 1975. Rule 11(e) sets forth the procedure a judge *shall* follow *if* he permits presentation of plea agreements to him; it does not, when viewed in light of the legislative history, require him ever to consider or listen to negotiated pleas. Any other interpretation would result in a charade if it is conceded that a judge has the authority to reject all plea agreements on principle (and out of hand) without even an examination of their content.

**4.** Judges should not shut their eyes to the dynamics of the process, or its effects, upon them personally—consciously or unconsciously. Some judges, like many lawyers, fear, or do not

room," sinister implications (albeit unjustified) which simply cannot be removed. The result: public cynicism and lack of faith in the integrity of the judicial process. In emphasizing expediency, allegedly based on dollar costs, plea bargaining derogates from the attempt of the Court to deal justice and substitutes therefor a concern for a cost efficient method of disposing of cases. Even if one accepts the validity of the cost argument, which this Court does not (in the federal system), it surely constitutes a poor justification for the process.

Inasmuch as plea bargaining provides leeway for a strong prosecutor to overwhelm a poorly prepared or timid defense counsel, or a strong defense counsel to take advantage of an inept or overworked prosecutor, there is a tendency to emphasize the disparity of counsel, which has less impact when a case is heard in open court, with all the attendant safeguards of a trial.[5] Perhaps only trial judges fully understand the pervasiveness of the "fear of trial" experienced by even excellent attorneys. Although good lawyers will not permit this fear to rise to the level of a conscious factor in plea negotiations, it must often remain subconsciously at work in the process, encouraging acceptance of a negotiated plea on some basis other than the merits.

Another point: when the convicted defendant goes to prison, the opportunity to compare bargains with other inmates and to speculate on what factors may have influenced the various outcomes lends itself to the creation of cynical disdain for a system that proclaims justice as its goal but, arguably, dispenses deals instead. And this Court is of the opinion that it is very important, overall, how the defendants within the system perceive the operation and effect of that system.

And what about the rights of the public? Assume that a United States Attorney chooses to present cases against a person to the grand jury, and the grand jury chooses to indict that person on the basis of the evidence. Now, assuming the integrity of the prosecutorial decision and the evidentiary basis therefor (and why should this not be assumed?), the rights of the public are immediately implicated. Either the man is guilty or he is not. The unimpeded process will produce the proper (just) result. But, one says, the prosecutor may *know* the defendant is guilty but simply cannot get the necessary evidence, so why not prosecute, get a deal and at least put him away for a while? Prosecutorial integrity? Sound public policy? Query.

---

like trials. They would like to avoid them. All judges welcome the settlement of civil cases. Few are unhappy when a defendant, charged with a crime, decides to plead guilty. There certainly is nothing wrong with such feelings or attitudes. Where negotiated pleas are not accepted, these natural attitudes have no effect on the dispensation of justice. But now introduce plea bargaining. Suddenly the decision of the judge to accept or reject a plea bargain may make the difference between a hard six-weeks trial or, possibly, a chance to clean up his motion calendar. This could conceivably influence his decision—even if only on a subconscious level. Additionally, the reputation of the judge becomes a significant factor in the ability of the prosecutor, or the defense counsel, to prevail upon the defendant to agree to a plea bargain. If it can be demonstrated from the record that those who go to trial and lose get the "book thrown" at them, or that it "will cost you to see the hole card" (*i. e.*, if one pleads not guilty and goes to trial), chances are that the defendant will seek an agreement. If, on the other hand, the judge has a reputation for being lenient or even fair, defendants and defense attorneys would be less likely to feel the compulsion to agree. So, nationwide, the process would tend to disparity rather than uniformity. And many argue cogently that reasonable uniformity should be a goal of the federal criminal justice system. So, consciously or unconsciously, a judge may act in a way which has an effect one way or the other on the entire plea bargaining process, perhaps entirely unknown to him.

5. "Plea bargaining is inherently destructive of the values of the trial process, for it is designed to prevent trials. The practice forfeits the benefits of formal, public adjudication; it eliminates the protections for individuals provided by the adversary system and substitutes administrative for judicial determinations of guilt; it removes the check on law enforcement authorities afforded by exclusionary rules; and it distorts sentencing decisions by introducing noncorrectional criteria."

*The Unconstitutionality of Plea Bargaining*, 83 Harv.L.Rev. 1387, 1397–98 (1970).

Revealing the existence of plea bargains and their content is, of course, superior to the silent acceptance of *sub rosa* plea agreements. It is obviously preferable to require that the process be spread on the record to maximize protection for the accused and the public. The 1975 Amendments to Rule 11 were therefore better than no change at all, considering then existing actual practices. However, it may be time to make a thorough review of the policies underlying those amendments as well as the practices which have evolved since the addition of section (e) in 1975. In the opinion of this Court, even plea agreements acknowledged in the record do not serve the cause of justice. It would be better to insist that there be none (except *possibly* in cases involving great national interests, perhaps certified to, as such, by the Attorney General or the President himself.) Rule 11(e) at least allows the Court the option to refuse to hear bargained pleas. This Court exercises its discretion by so refusing, thereby giving no sanction to the practice.

It has been said that without plea bargaining the wheels of justice would grind to a halt and that efficient administration of the courts requires the use of plea agreements. This Court doubts the factual basis for this argument in the federal court context. It has been able to handle its criminal docket expeditiously, and has not found clear-cut evidence that there is any great disparity in the percentage of its criminal cases which proceed to trial, when compared to courts in other districts which do accept plea agreements.[6] Even if the refus-

al to accept plea bargains clearly results, overall, in a greater number of trials, what difference should this make? That is what the courts are for. They should not be considered agencies created to preside over settlement negotiations. But what about delay? The simple answer is that there can be no significant delay in the disposition of criminal cases in the federal system based on clogged dockets. If the Constitution were not enough, we have the Speedy Trial Act.

Further, there must be more than a lingering concern, when a negotiated plea is heard, that an innocent defendant has been prevailed upon, or has chosen to "play the odds," rather than to staunchly maintain his innocence. In fact, must it not be accepted by the proponents of plea bargaining that, statistically, a certain number of innocent people will suffer judicial penalties *because of that system*? The potential risk of consequences of much greater penalties may drag from the mouth of an innocent man a guilty plea if it is coupled with the guarantee of a significantly lesser penalty. One can say that, in such situations, the defendant is simply exercising rational choices affecting his self-interest. That is true, and it may not be unreasonable for him to make such a choice. But should the federal criminal justice system give an innocent man that choice? This Court says, "No."[7]

We always get back to it: when is a plea voluntarily made? The plea "taken to avoid the risk of being convicted of a more serious crime . . . is truly no more

---

**6.** A study of the impact of acceptance of plea bargains on the number of cases going to trial would not be difficult, using statistics already gathered by the Administrative Office of the United States Courts. According to the statistics available at present, there is a variation between the districts in the percentage of cases going to trial, but it is impossible to ascertain the relationship of those variations to plea bargaining. An empirical study would indicate the nature of that relationship, if any. Such a study could also seek to determine where the percentage of trials, when compared to other dispositions, would level out if no plea bargaining at all were permitted, since it is logical to assume that, because the practice is presently

permitted, many defendants will not plead guilty unless tendered some such bargain. Absent such a possibility, would not many such defendants simply plead guilty?

**7.** And it is not enough to counter that the Court does not have to accept any bargain and, further, that the Court has an affirmative duty to explore the factual basis of the guilty plea. Once an innocent man has determined, in his self-interest, to lie by pleading guilty, he will know also that it will all go for naught if he does not further lie about the underlying facts. The system should be such as will, as far as possible, remove such compulsions.

voluntary than is the choice of the rock to avoid the whirlpool." [8]

It is therefore Ordered that the motion to hear the plea agreement in this case be, and it is hereby, denied.

---

8.  Kuh, Book Review, 82 Harv.L.Rev. 497, 500 (1968).